SOLLIE E. McCRELESS and LILLA M. McCRELESS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McCreless v. Commissioner
Docket No. 4941-77.
United States Tax Court
T.C. Memo 1980-484; 1980 Tax Ct. Memo LEXIS 105; 41 T.C.M. (CCH) 279; T.C.M. (RIA) 80484; October 27, 1980, Filed Richard F. McDivitt,Patrick J. Casey, and Gene A. Castleberry, for the petitioners. W. Taylor Overton, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined a deficiency of $32,998.13 in petitioners' Federal income tax liability for their taxable year 1972. The issue is whether the proceeds of a loan which petitioner Sollie McCreless (hereinafter petitioner) guaranteed were used in the trade or business of the borrowers within the meaning of section 166(f) of the Internal Revenue Code *106 of 1954, [1] as in effect during the taxable year before the Court. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.
Petitioners filed their joint 1972 Federal income tax return with the Internal Revenue Service Center, Austin, Texas. At the time their petition in this proceeding was filed, petitioners resided in San Antonio, Texas. At all times relevant to this controversy, petitioner owned 99.96% of the outstanding common stock of American Securities Company. American Securities Company in turn owned over 50 percent of the outstanding common stock of American Hospital and Life Insurance Company (hereinafter referred to as Hospital). In addition, petitioner personally owned at least 420,000 shares of the outstanding common stock of Hospital. From the time of their respective incorporations, petitioner has served as president of both corporations. Prior to 1966, two men by the name of Spaugh and Denison were vice president and president, respectively, *107 of Capital Securities, Inc. (hereinafter CSI), a firm engaged in the business of buying and selling securities to the public. Denison owned stock in CSI; neither Spaugh nor petitioner owned any CSI stock. Spaugh derived income from CSI only in the form of commissions paid by customers of the firm based upon sales made by Spaugh and salesmen who worked under him. For approximately a year before May 19, 1966, CSI had been "making a market" in the stock of Hospital and of several other companies. A brokerage firm "makes a market" in a given stock when it agrees to carry a certain amount of the stock in its inventory and to buy or sell the stock at the most favorable market price in lots of at least 100 shares. During this time, the market value of these stocks was declining and as a result CSI ran afoul of the Securities and Exchange Commission's (SEC) net capital requirements for brokerage firms. For purposes of determining whether a firm has sufficient net capital to remain in business, the SEC evaluates its inventory of securities at their current market value rather than at their cost to the firm. Due to the the decline, the SEC notified CSI that it had insufficient net capital *108 to satisfy regulatory requirements and allowed it to attempt to correct the situation. CSI was unsuccessful, however, and was forced to cease operations on May 19, 1966. On April 29, 1966, Denison and Spaugh purchased 8,300 shares of Hospital stock from CSI. On May 19, 1966, the same day that CSI ceased operations, they purchased an additional 9,200 shares of Hospital stock from SCI. They borrowed the funds to make these purchases from various banks in San Antonio, securing the loans by pledging the Hospital stock. Sometime after the loans were made, petitioner executed agreements with the various banks guaranteeing them. The original loans were ultimately consolidated at the Bexar County National Bank (hereinafter the Bank) and were renewed a number of times before September 29, 1971. Petitioner continued his guarantee of all renewals. On the latter date, Denison and Spaugh renewed the consolidated loan by executing a note in the principal amount of $240,321.90 payable to the Bank. Petitioner also guaranteed payment of this note. Interest of $7,072.13 accrued on the note from September 29, 1971, to February 1, 1972; Spaugh and Denison paid $1,750 on the note. As of February 11, 1972, unpaid *109 principal and interest on the note totaled $245,644.03. The note became due on December 30, 1971. In early January 1972, the Bank demanded payfment from Spaugh and Denison, who failed to pay the note. Subsequently, the Bank demanded payment from petitioner as guarantor. On February 11, 1972, the 17,500 shares of Hospital stock which had been pledged as security on the loan were sold by the Bank to petitioner at a public sale for $98,434.50, and the proceeds were applied to the note. In the same month, petitioner paid $147,206.53 to the Bank in discharge of his liability as guarantor. At the time he made this payment, the obligation of Denison and Spaugh tof the Bank was worthless to the extent of $147,206.53. Denison has known petitioner for most of his life. They first met when Denison was very young, about ten or twelve years old. At the time of trial, Denison was approaching sixty years of age. The two have had business dealings over the years. Petitioners, on their 1972 Federal income tax return, deducted in full petitioner's payment in satisfaction of his guarantor liability as a business bad debt. In his statutory notice of deficiency, the Commissioner determined *110 that the payment gave rise only to a worthless nonbusiness debt which, under section 166(d), should have been treated as a short-term capital loss. OPINION As in effect for the taxable year 1972, the pertinent parts of section 166 provided: SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly Worthless Debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (d) Nonbusiness Debts.-- (1) General Rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. (f) Guarantor of Certain Noncorporate *111 Obligations.--A payment by the taxpayer (other than a corporation) in discharge of part or all of his obligation as a guarantor, endorser, or indemnitor of a noncorporate obligation the proceeds of which were used in the trade or business of the borrower shall be treated as s debt becoming worthless within such taxable year for purposes of this section (except that subsection (d) shall not apply), but only if the obligation of the borrower to the person to whom such payment was made was worthless (without regard to such guaranty, endorsement, or indemnity) at the time of such payment. It is clear, and neither party contends otherwise, that petitioner's guarantee of the loan to Denison and Spaugh and his subsequent discharge thereof were not connected with any trade or business he might have been engaged in at any relevant time. Thus, to avoid application of section 166(d) and resultant capital loss treatment, petitioner bears the burden of proving that section 166(f) applies. Welch v. Helvering, 290 U.S. 111 (1933). It is conceded that the loan to Denison and Spaugh was noncorporate and that the loan was worthless to the Bank at the time of petitioner's payment. *112 Thus, the only issue is whether Denison and Spaugh used the loan proceeds in their trade or business. Petitioner contends, and Denison and Spaugh testified, that they purchased the Hospital stock from CSI in order to achieve compliance with SEC regulations, thus permitting CSI to continue operations, enabling themselves to continue earning their salary and commissions, and preserving their business reputations. It is true that a corporate employee is in the "trade or business" of holding such a position, and that activities which he undertakes to preserve his employment are proximately related to such "trade or business." Trent v. Commissioner, 291 F.2d 669 (2d Cir. 1961); Whipple v. Commissioner, 373 U.S. 193 (1963). To prevail here petitioner must show that Denison and Spaugh's dominant motive in purchasing the stock from CSI was to protect their salaries and status as employees. It is not sufficient that preservation of salary income was merely a significant motive. United States v. Generes, 405 U.S. 93 (1972). Guided by this standard, we are not persuaded that petitioner has met his burden. First, there was no evidence *113 as to the amount of Denison and Spaugh's annual salaries at the time they took out the loan; yet, the Court in Generes considered such evidence to be highly critical in determining motivation, 405 U.S. at 106-107. The amount of the loan was substantial (over $200,000) and unless Denison and Spaugh's earnings were also substantial, motives other than protection of employee status would be indicated. Second, 100% of the Hospital shares were purchased less than three weeks, and over 50 percent less than a day, before CSI ceased operations. It is difficult to see how these belated purchases, especially the final one, could have placed CSI even in temporary compliance with SEC regulations. Denison and Spaugh could have had little reasonable expectation at such a late date that further infusions of working capital would preserve CSI's existence. Third, it is less than clear just how propping up CSI was to preserve their reputations, which would seem to be dependent upon factors beyond their control, e.g., the market performance of stocks which they had recommended to clients. Fourth, petitioner has advanced no reason why, in order to unload "bad" inventory, CSI could *114 not simply have sold the Hospital stock to third parties, obviating the need for Denison and Spaugh to obtain a loan and for petitioner to guarantee the loan. We are not convinced that, as respondent argues, Denison and Spaugh purchased the stock as a personal investment. We simply conclude that whatever their actual motive was, it was not to preserve their status as employees of CSI. Thus, petitioner's payment in satisfaction of his guarantee must be treated as a loss from the worthlessness of a nonbusiness debt, governed by section 166(d). Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and applicable to 1972.↩