SAMUEL R. WINSLOW and JEAN M. WINSLOW, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Winslow v. Commissioner
Docket No. 1126-79.
United States Tax Court
T.C. Memo 1983-158; 1983 Tax Ct. Memo LEXIS 627; 45 T.C.M. (CCH) 1064; T.C.M. (RIA) 83158; March 23, 1983. William L. Bricker, Jr. and Edward A. Kotite, for the petitioners. Jack H. Klinghoffer, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined the deficiencies in the petitioners' Federal income tax for the taxable years and amounts as follows: Year
Deficiency
1970
$45,611.95
1971
32,304.49
1972
34,265.46
1973
19,319.73
1974
24,672.70
1975
28,597.33
*628 After concessions by the parties, the issue for decision is whether a loss sustained by the petitioners in 1973 in the amount of $494,947.37 is deductible as a "business" or "nonbusiness" bad debt. FINDINGS OF FACT Some of the facts are stipulated. The stipulation of facts and stipulated exhibits are incorporated herein by this reference. Petitioners, Samuel R. Winslow and Jean M. Winslow, are husband and wife and resided in New York, New York, at the time they filed their petition in this case. They filed joint Federal income tax returns for the taxable years 1970 through 1975 with the Internal Revenue Service office in Holtsville, New York. References to petitioner in the singular will refer to Samuel R. Winslow because the issue we must consider concerns his business activities. Petitioner has been engaged solely in the securities brokerage industry since 1929. Petitioner entered the securities business as a runner. He then became a clerk, a salesman, and a branch office manager for the firm of Dyer, Hudson. In 1937, petitioner formed his own securities brokerage firm, Winslow and Douglas. That firm merged with the firm of Beverly Bogart and Company, changing *629 its name to Winslow, Douglas, and MacAvoy. Subsequently, this firm merged with Cohu and Company and Stetson Securities, changing its name to Winslow, Cohu & Stetson, Inc. In 1965, petitioner was the Chief Executive Officer, a director, and the controlling (49 percent of the voting stock) shareholder of Winslow, Cohu & Stetson, Inc. (WCS). He was also an account executive primarily responsible for individual accounts. Petitioner was never in the business of making loans or promoting corporations. At the time of the transaction at issue petitioner was approximately 60 years old and had been engaged solely in the securities brokerage industry for approximately 40 years. WCS experienced serious operating problems in 1967 and 1968, relating to back office operations and the satisfaction of the New York Stock Exchange capital requirements. In 1969, a defalcation occurred in one of WCS's branch offices. Due to the then unknown size of the loss attributable to this defalcation, and due to substantial losses incurred through back office operations, WCS received a notice in August, 1969, stating that its fidelity insurance policy would be cancelled, in accordance with the terms of *630 the policy, in 30 days (the "30-Day Period"). This event would put the firm out of business because a securities brokerage firm cannot operate without a fidelity insurance policy. During the 30-Day Period, petitioner sought employment as an account executive with another securities brokerage firm and sought to merge WCS with another securities brokerage firm in order to avoid the mandatory liquidation of WCS required by the New York Stock Exchange rules. During the 30-Day Period, petitioner consulted with approximately 10 securities brokerage firms in an effort to obtain employment and arrange a merger. The only firm to offer petitioner a guaranteed salary plus commissions was Weis, Voisin, Cannon, Inc. (Weis). Petitioner negotiated primarily with Stuart J. Voisin, Chairman of the Board of Directors of Weis, although Herbert S. Cannon, the president and one of the chief operating officers of Weis, was also involved in the negotiations. The parties agreed to an employment contract, evidenced in writing and covering a three-year period, which provided petitioner an annual salary of $25,000 plus commissions on petitioner's business at the full rate paid to partners of Weis. This *631 commission rate was 40 percent of the commissions paid by the customers to Weis. Petitioner also negotiated an agreement with Weis providing for Weis' acquisition of the assets of WCS. At this time WCS had 500 employees, 8 to 10 branch offices, and 20,000 customers. The terms of the agreement with Weis were as follows: Weis would acquire substantially all the assets and customers' accounts of WCS; Weis would assume none of the liabilities of WCS, except for a lease on certain office space; Weis would marshall the assets of WCS and conduct an orderly liquidation of the business of WCS, for which services Weis would receive a fee of $100,000; Weis would place in escrow for the WCS shareholders Weis stock and debentures with a par value of $1,500,000; such securities would be distributed from escrow to the WCS shareholders if WCS' assets on September 29, 1969, exceeded its liabilities by $1,500,000; if the liabilities of WCS exceeded its assets, the stock and debentures would be cancelled and the former WCS shareholders, including petitioner, would receive nothing. The payment of the escrowed consideration was not related to any future success of the combined enterprises; rather, *632 the payment of the consideration was dependent upon whether or not, on September 29, 1969, WCS had assets in excess of its liabilities. A report of WCS' financial condition as of June 29, 1969, prepared by Haskins & Sells on September 25, 1969, indicated that due to the accountants' inability to satisfy themselves as to $1,500,000 in missing securities, $1,800,000 in securities held by transfer agents, the adequacy of reserves for estimated losses, and the possibility of recovery on an insurance claim, they were able to state noopinion concerning shareholders' equity, reserves for losses, or "the over-all financial position" of WCS. As a condition to petitioner obtaining his employment arrangement with Weis, and Weis acquiring the assets of WCS, petitioner was required to transfer his WCS subordinated loan account to Weis. The balance of the subordinated loan account was to continue to be subject to the claims of creditors of WCS; furthermore, such amounts were to be subject to the claims of creditors of Weis as well. The agreement between Weis and WCS provided that if petitioner were discharged without cause by Weis during the term of his employment agreement, Weis *633 would return to petitioner the entire amount of petitioner's subordinated loan, less a reserve to be agreed upon to satisfy unpaid liabilities of WCS. The subordinated loan account with Weis provided for interest at the rate of four percent on securities and nine percent on cash. As of September 30, 1969, the balance of petitioner's subordinated loan accounts were as follows: Cash
Securities
Total
Cost
Value
Basis
Value
$520,152.61
$83,817.01
$169,570
$603,969.62
$689,722.61
Had petitioner not transferred his subordinated loan account to Weis, Weis would not have employed him. The fair market value of petitioner's stock investment in WCS was zero at the time he made his subordinated loan to Weis. At this time he also was not a shareholder in Weis. If petitioner had not been successful in merging his company with another company, petitioner's firm would have been closed down, his customers damaged, and petitioner would not have been able to maintain his trade or business as a securities broker or, had he been able to maintain his trade or business, it would have been maintainable only at a substantially diminished level. Petitioner's *634 total compensation from WCS for 1967-1969 was as follows: 1967--$40,000; 1968--$41,500; 1969--$38,228. Petitioner's total compensation from Weis was as follows: 1970--$60,726; 1971--$46,790; 1972--$42,764. In addition, in 1973 he received $21,230 prior to Weis' filing for bankruptcy on May 24, 1973. The above figures represent 100 percent of petitioner's earned income during those years, except that petitioner had $9,415 of income from another source in 1973. Shortly after the liquidation of WCS commenced, it became evident that WCS' liabilities on June 29, 1969, exceeded its assets with the result that the escrowed Weis stock and debentures issued pursuant to the purchase agreement were cancelled in early 1970 and Weis notified the WCS shareholders that they would be required to cover the WCS deficit by either the payment of each or the invasion of their subordinated loan accounts in accordance with the terms of the acquisition agreement. On June 23, 1970, petitioner's subordinated loan account with Weis was invaded to the extent of $155,981 to satisfy WCS creditors. The balance of petitioner's subordinated loan account on June 30, 1970, was as follows: Cash
Securities
Total
Cost
Value
Basis
Value
$364,679.16
$89,975.04
$111,549.76
$454,654.20
$476,228.92
*635 At approximately the same time that petitioner's subordinated loan account was invaded, Weis coerced petitioner into subscribing for 1,000 shares of Weis stock for the aggregate price of $25,000. Petitioner paid only $5,000 of the purchase price for the 1,000 shares of Weis stock at the time the subscribed for such stock. He never paid the remainder of the purchase price. In March, 1972, petitioner was again "offered" 1,000 shares of Weis stock for a price of $25,000. When petitioner was "offered" the Weis stock in March, 1972, he was nearing the end of his written employment arrangement and believed that had he not purchased such stock, he would have been terminated. Petitioner paid $20,000 of the purchase price for the shares he purchased in March, 1972. Petitioner never paid the remainder of the purchase price. In December, 1972, Weis concluded that petitioner was an "insider" and that under New York Stock Exchange rules he was required to convert his subordinated loan to a secured demand note. Therefore, on December 27, 1972, petitioner executed a secured demand note and collateral agreement, each in the amount of $400,000, effectuating that arrangement. In early *636 1973, Weis experienced financial difficulties which culminated in its bankruptcy. On May 24, 1973, the District Court for the Southern District of New York appointed a trustee under the Securities Investors Protection Act to gather and liquidate all of Weis' assets. The balance of petitioner's loans to Weis on that date were as follows: Cash
Securities
Total
Cost
Value
Basis
Value
$75,748.87
$374,103.72
$410,583.50
$449,852.59
$486,332.37
Petitioner sustained a business bad debt loss in 1973 in the amount of $494,947.37. OPINION Petitioner had been engaged in the securities brokerage business as an account executive for approximately 40 years. Due to major operating problems and resulting losses, petitioner's stock brokerage firm was subject to liquidation for its inability to comply with New York Stock Exchange rules requiring casualty insurance. Such an occurrence would have left petitioner unemployed at age 60 and, due to the hardship that such a forced liquidation would cause petitioner's customers, would diminish petitioner's goodwill in the business to such extent that it would seriously impair, if not prevent, petitioner *637 from continuing his trade or business as a securities broker. The fair market value of petitioner's investment in his firm at this time was zero. In light of these facts, petitioner began to negotiate with other securities brokerage firms to obtain employment for himself as a securities broker and for the new firm to take over WCS, wind-up its business and distribute its assets to creditors in a manner that would minimize hardship to its customers. Petitioner eventually negotiated an employment arrangement and acquisition agreement with Weis. The employment arrangement, evidenced in writing, was for a three-year period with an annual salary of $25,000 plus full partner commission rates on petitioner's brokerage business, which was substantial. The acquisition agreement provided that Weis would take over WCS' assets, would not assume its liabilities, and would liquidate WCS in an orderly fashion. Other than the employment agreement, the only possible consideration that petitioner might receive from Weis was escrowed securities to be paid if petitioner's firm had a positive net worth as of the date of the transfer of its assets to Weis. An audit conducted after the acquisition *638 established that WCS had liabilities in excess of its assets; therefore, petitioner received nothing under the acquisition agreement. Petitioner was required as a condition of his employment agreement with Weis to transfer his WCS subordinated loan account to Weis. This would continue to be subject to the creditors of WCS and would now also be subject to the creditors of Weis. In 1973 Weis declared bankruptcy and petitioner's subordinated loan account became worthless. Section 166[1] permits deductions for both business and nonbusiness bad debts; in the case of nonbusiness bad debts, however, section 166(d) treats the loss deduction as a short-term capital loss. A debt will be characterized as a business bad debt, for which a full deduction is allowable, if there is a proximate relationship between the loss and the taxpayer's trade or business; otherwise it is a nonbusiness bad debt. Sec. 1.166-5(b), Income Tax Regs.
*639 Petitioner maintains that the debt in issue was proximately related to his trade or business of being an employee, specifically as a securities broker. Respondent's first argument is that petitioner cannot be in the trade or business of being an employee because he was one of the owners of WCS. Respondent buttresses this argument as follows: "Petitioner was the owner of his company and was forced to sell his company to another firm. Under these circumstances the petitioner has no argument that the transaction was conducted as an incident to his trade or business of being an 'employee'." It is clear that petitioner may be in the trade or business of being an employee. Primuth v. Commissioner,54 T.C. 374 (1970). Respondent's argument that petitioner cannot be in the trade or business of being the employee of a corporation that he also owns is obviously without merit. This is emphasized by the fact that we must from time to time determine whether a bad debt is related to a taxpayer's trade or business of being an employee where he is also a shareholder of the corporation. *640 An example of this is United States v. Generes,405 U.S. 93 (1972), upon which respondent himself relies. The balance of respondent's argument betrays his misunderstanding of the facts. Throughout trial and on brief respondent continually insisted that the transaction at issue was a sales transaction. This greatly oversimplifies the matter. Petitioner was an owner of what appeared to all to be a worthless corporation. While his corporation might prove to have some value, this outcome appeared remote. Petitioner and Weis negotiated and consummated two separate transactions. Weis would purchase and liquidate WCS. Petitioner stood to gain Weis stock if WCS proved to be of value. In addition, petitioner became an employee of Weis. This employment was conditioned on petitioner's transfer to Weis of his WCS subordinated loan account. This transfer would only relate to petitioner's future employment with Weis. It could not enhance the probability that WCS would have value so that the petitioner would ultimately receive Weis stock. His loan account was already subject to the debts of WCS. What was new was that this loan account would now be subject to the creditors *641 of Weis, irrespective of whether or not etitioner ever owned stock in Weis. Clearly, the transfer of petitioner's subordinated loan account was related to petitioner's future employment with Weis and not the sale of WCS to Weis. Respondent's second argument is that petitioner's "dominant motivation in transferring his subordinated loan account to Weis was not for the purpose of obtaining employment." This assumes that petitioner must show a dominant motive, under United States v. Generes,supra. The Supreme Court in Generes found that where a shareholder-employee incurs a bad debt we must look to the taxpayer's dominant motive to determine whether it was proximately related to his trade or business of being an employee of the corporation. We do not believe the Generes analysis is appropriate in this case. The petitioner was not a shareholder in Weis at the time he transferred his subordinated loan account to Weis. If this were the only relevant circumstance, it would be clear that Generes would not apply for the Generes analysis presupposes a need *642 to discriminate between two potential motives for making a loan, as employee or as shareholder. Judge Tannenwald clearly noted this distinction in his concurring opinion in Cremona v. Commissioner,58 T.C. 219, 223 (1972): In the case of single-purpose expenditures, a simple comparison of the position which the taxpayer occupied before and after the anticipated change would suffice. See my concurring opinion in David J. Primuth,supra. Compare sec. 1.162-5(b)(3), Income Tax Regs. In the case of dualor multiple-purpose expenditures, the presence of a direct relationship and a dominant or primary motive would be the critical factors. Compare United States v. Generes,405 U.S. 93 (1972); secs. 1.162-2(b), 1.162-5(d), and 1.162-5(e), Income Tax Regs.
In the present case, however, there is also the expectancy, although remote, that WCS might prove to have value and that petitioner would receive stock in Weis as a result. But this is an illusion. The transfer of petitioner's subordinated loan account that subsequently *643 gave rise to the loss at issue related only to petitioner's employment in Weis, as we have previously explained. Even if a motive existed which related to the acquisition of stock, under Generes,supra, we would find the motive related to employment to be dominant. In addition to the above, respondent makes a number of arguments which are totally without merit. We will not separately discuss these here except to say that for the most part they are based on facts not in evidence, and inferences which cannot reasonably be drawn from the evidence. Based on the foregoing and the record before us we find that petitioner's loan to Weis was proximately related to his trade or business of being an employee as a stockbroker. Petitioners are accordingly entitled to a business bad debt deduction in the year in which the loan became worthless under section 166(a), which the parties agree to be 1973. Decision will be entered for the petitioners.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended. For the years in issue, section 166 provided in relevant part as follows: Sec. 166. (a) GENERAL RULE.-- (1) WHOLLY WORTHLESS DEBTS.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (d) NONBUSINESS DEBTS.-- (1) GENERAL RULE.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) NONBUSINESS DEBT DEFINED.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩