HUGH L. HUTTON and DOROTHY L. HUTTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hutton v. Commissioner
Docket Nos. 1513-71, 6493-72.
United States Tax Court
T.C. Memo 1976-6; 1976 Tax Ct. Memo LEXIS 402; 35 T.C.M. (CCH) 16; T.C.M. (RIA) 760006; January 7, 1976, Filed Bruce Peterson, for the petitioners. G. Phil Harney, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax as follows: YEAR
DEFICIENCY
1965
$ 178.34
1966
6,312.93
1967
3,253.48
1968
7,192.42
Several of the issues were resolved by the parties prior to trial. The following *404 issues are presented for decision: (1) Whether petitioners are entitled to an investment credit pursuant to sections 38, 46 and 48, Internal Revenue Code of 1954, [1] on a gas compressor unit as claimed on their 1965 Federal income tax return; (2) Whether losses sustained as a result of loans made by Petitioner Hugh Hutton to bank customers and in connection with sales of real estate, oil royalties, and personal property are deductible as business bad debts under section 166(a)(1); [2]
(3) Whether losses resulting from the worthlessness of notes acquired by Hugh Hutton from the First National Bank of Braman, Oklahoma are entitled to business bad debt treatment; and (4) Whether petitioners are entitled to a business bad debt deduction on the worthlessness of notes received on the sale of Hugh Hutton's stock. *405 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and exhibits are incorporated by this reference. Petitioners Hugh L. and Dorothy L. Hutton, husband and wife, resided in Braman, Oklahoma, when they filed their petition in this proceeding. Petitioners' joint Federal income tax returns for the taxable years 1965, 1966 and 1967 were filed with the District Director of Internal Revenue, Oklahoma City, Oklahoma. Petitioners filed their joint Federal income tax return for the taxable year 1968 with the Southwest Service Center, Austin, Texas. Hugh L. Hutton (hereinafter sometimes referred to as petitioner) was the president of the First National Bank of Braman, Oklahoma during the years 1965, 1966 and 1967, and was managing officer of such bank for approximately 20 years prior to acquiring control of the bank on January 1, 1968. Petitioner was also engaged in oil production, farming, trading in real estate, equipment rentals, and as an agent for others in real estate and loan transactions. Investment Credit
On February 18, 1965, petitioner, in connection with his oil and gas production business, *406 entered into an agreement with Gas Compressor Services, Inc., of Tulsa, Oklahoma, providing for the rental of a gas compressor unit at the rate of $1,000 per month. The lease agreement stated that the unit had a value of $26,250 and granted petitioner an option to purchase the unit on notice in writing. Petitioner leased the compressor unit until September 1965, at which time he purchased the unit from Gas Compressor Services. The unit was built in 1964 and was rented to Swab Co., Inc., in April 1964 and to Texaco in November 1964. Prior to the time the unit was leased to petitioner, it was reconditioned, sandblasted and repainted. The 1965 corporate income tax return of Gas Compressor Services did not contain a statement that the investment credit would be taken by petitioner rather than Gas Compressor Services. On their 1965 Federal income tax return petitioners claimed an investment credit under sections 38, 46 and 48, Internal Revenue Code of 1954, on the gas compressor unit. The Commissioner, in his statutory notice of deficiency, determined that the gas compressor unit did not constitute a "qualified investment" as defined in the regulations. Bad *407 Debt Deductions
In 1962 petitioner obtained a loan for $40,000 in order to enter into the business of lending money. Petitioner, during the years 1962 through 1967, engaged in more than 100 loan transactions from which he earned in excess of $4,000 in interest. Petitioner did not advertise that he was in the business of lending money nor did he maintain a separate office for his loan business. Many of the loans were made to persons who did not qualify for bank loans. Such persons believed that they were borrowing from the First National Bank of Braman rather than from petitioner because regular forms of the bank were used. Loans made by petitioner could be distinguished from regular bank loans by notations on the customers' files. Petitioner's loans were serviced by regular bank personnel. Petitioner also occasionally made loans to customers when they had overdrafts with the bank. In addition, petitioner often took notes as part of the sales price when he sold real estate, oil royalties, and personal property. Petitioner had a practice of acquiring notes from the First National Bank of Braman, Oklahoma whenever such notes were criticized by bank examiners. A regular examination *408 of the bank in October 1967 revealed that approximately 80 percent of the capital structure of the First National Bank of Braman, Oklahoma, consisted of notes representing substandard or doubtful loans. In January 1968 another examination was made in which it was concluded that approximately $100,000 in notes were not collectible. It was further concluded that approximately another $150,000 in notes were of substandard or doubtful classification. On February 8, 1968, petitioner entered into an agreement with the First National Bank of Braman, Oklahoma, and seven other individuals referred to as contributors. The agreement provided that an aggregate balance of $229,000 in unpaid loans were to be transferred to the contributors for $100,000. The purpose of the agreement was to assist the bank in the collection of the loans. Petitioner, as trustee, was to effect collection on the notes and was to receive $750 per month for his services. Under the terms of the agreement petitioner guaranteed the contributors the collection of the full amount of their contributions. In April 1968, petitioner entered into a contract to sell to J. W. Boone 187-1/2 shares of common stock of the First National *409 Bank of Braman, Oklahoma, having a cost basis of $94,943.60, for a total sales price of $204,541.87. A cash payment of $110,000 was made at the time of closing, the sum of $83,887.57, representing notes classified as doubtful by an examination of April 23, 1968, was placed in escrow, and the balance was payable in two equal installments on May 1, 1969 and May 1, 1970. Under the terms of the agreement, delivery of the doubtful notes to petitioner constituted payment against the purchase price in the full face amount of the notes. On their Federal income tax returns for the years 1966 and 1967, petitioners claimed business bad debt deductions under section 166(a)(1) for losses sustained as a result of loans made to bank customers and in connection with sales of property. On both their original and amended Federal income tax returns for the year 1968 petitioners reported $204,541.87, the total sales price, as the amount realized on the sale of the 187-1/2 shares of bank stock. On their amended return for the year 1968 petitioners claimed a business bad debt deduction of $194,379.40 for losses allegedly sustained primarily from the worthlessness of the notes acquired pursuant to the *410 agreement of February 8, 1968 and the notes received in connection with the sale of the bank stock. The Commissioner, in his statutory notice of deficiency, determined that the loans made by petitioner to bank customers and persons to whom he sold property were not created in connection with petitioner's trade or business. He further determined that the $100,000 payment to the bank represented a contribution to capital. In addition, the Commissioner reduced the amount reported as realized on the sale of the bank stock by the face amount of the notes received which became worthless in 1968 and disallowed the business bad debt deduction claimed on the worthlessness of such notes. ULTIMATE FINDINGS OF FACT 1. Petitioner was engaged in the business of lending money for profit. 2. Petitioner's loans to bank customers and in connection with sales of property were proximately related to his business of lending money. 3. Petitioner's dominant motivation in acquiring the notes criticized by bank examiners pursuant to the agreement of February 8, 1968, was to service the loans in the ordinary course of his loan business. 4. The notes received by petitioner on the sale of his bank *411 stock had no ascertainable fair market value on the date of sale. OPINION Investment Credit
On February 18, 1965, petitioner entered into an agreement with Gas Compressor Services, Inc., providing for the rental of a gas compressor unit. The unit had been previously leased to two different lessees in 1964 and was reconditioned prior to the time it was leased to petitioner. In September of 1965, petitioner exercised his option to purchase the unit. The issue for decision is whether petitioners are entitled to an investment credit pursuant to sections 38, 46 and 48, on the gas compressor unit as claimed on their 1965 income tax return. Respondent contends that petitioners are not entitled to an investment credit on the gas compressor unit as claimed on their 1965 income tax return for the following reasons: (1) Gas Compressor Services could not "pass through" the investment credit on the reconditioned portion of the property to petitioner-lessee under section 48(d) since the original use of such property did not commence with petitioner; (2) even if Gas Compressor Services could otherwise pass through the investment credit on the reconditioned portion of the gas compressor *412 to petitioner, its original 1965 corporate income tax did not contain the requisite election; and (3) the unit does not qualify as "used section 38 property" because it was leased by petitioner prior to its acquisition. Petitioners argue that the investment credit should be allowed at least as to the cost of reconditioning the unit. Pursuant to section 48(d)(1)[3] a lessor of property entering into a lease on or before November 8, 1971, could elect to treat the lessee as having purchased such property provided certain conditions were satisfied. Section 1.48-4(a)(1)(iii), Income Tax Regs., sets forth the following condition of election: The property would constitute "new section 38 property" [as defined by section 48(b)] [4] to the lessee if such lessee had actually purchased the property. Thus, the election is not available if the lessee is not the original user of the property. * * * [Footnote added.] Section 1.48-4(b), Income Tax Regs., specifically provides that the lessee will not be considered the original user of the property *413 if it is "reconstructed, rebuilt, or reconditioned property." Because the property in question was reconditioned prior to its rental to petitioner, Gas Compressor Services could not elect to "pass through" the investment credit on the remodeled portion to petitioner under section 48(d). The investment credit *414 provisions allow a credit for a taxpayer's "qualified investment" in "used section 38 property." [5] Petitioners appear to take the position that the gas compressor unit constitutes "used section 38 property." Section 48(c)(1) provides that "property shall not be treated as 'used section 38 property' if, after its acquisition by the taxpayer, it is used by a person who used such property before such acquisition." Section 1.48-3(a)(2)(i), Income Tax Regs., provides in pertinent part as follows: * * * where a lessee has been leasing property and subsequently purchases it (whether or not the lease contains an option to purchase), such property is not used section 38 property with respect to the purchaser because the property is being used by the same person who used it before its acquisition. * * * Accordingly, petitioners are not entitled to an investment credit on the gas compressor unit as claimed on their 1965 income tax return. *415 Bad Debt Deductions
The issue for decision is whether petitioners are entitled to business bad debt deductions under section 166(a)(1) for losses sustained from the worthlessness of various obligations. Due to the diverse origins of the worthless debts, the obligations must first be categorized according to the manner in which they were acquired. The characterization of each category of bad debts must then be decided separately as the classification of one category will not determine the character of the others. The categories into which the obligations must be divided for purposes of decision are as follows: (1) loans made by petitioner to bank customers and in connection with sales of property, (2) notes acquired by petitioner after criticism by bank examiners, and (3) notes acquired as consideration in the sale of petitioner's bank stock. Petitioners contend that all of the bad debts in question constitute business bad debts and are deductible in full from ordinary income under section 166(a)(1). Their position is that petitioner was in the business of lending money for profit and that the bad debts were created or acquired in connection with such business. Respondent, *416 on the other hand, argues that the obligations are nonbusiness bad debts and are subject to the limitations imposed on short-term capital losses. Respondent does not contest the worthlessness of the obligations nor the time of worthlessness, only their characterization. Section 166(d)(2) defines a nonbusiness bad debt as a debt of a taxpayer other than a corporation--other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. Under section 166, the character of a bad debt is determined by the relationship it bears to the taxpayer's trade or business. Only if the debt bears a proximate relationship to the taxpayer's trade or business will it qualify for business bad debt treatment under section 166(a). Sec. 1.166-5(b), Income Tax Regs. Otherwise, it will be classified as a nonbusiness bad debt. Whether a *417 bad debt is proximately related to the taxpayer's trade or business is determined by the "dominant motivation" of the taxpayer in creating or acquiring the debt. United States v. Generes,405 U.S. 93 (1972), rehearing denied 405 U.S. 1033 (1972). Petitioners contend that Hugh Hutton was in the business of lending money for profit and that the loans to bank customers and persons to whom he sold property were created in connection with such business, thus entitling petitioners to a business bad debt deduction on their worthlessness. In seeking to establish that petitioner was not in the business of making loans, respondent emphasizes the fact that petitioner did not actively seek out loan customers, did not advertise that he was in the loan business, and did not maintain a separate office for his loan business. See United States v. Henderson,375 F.2d 36 (5th Cir. 1967). We are convinced that petitioner was actively engaged in the business of lending money for profit. Beginning in 1962, after obtaining a loan for the specific purpose of entering into the loan business, and continuing until at least late 1967, petitioner made numerous *418 interest-bearing loans primarily to persons who did not qualify for bank loans or had overdrafts with the bank. In furtherance of his loan business, he often took notes as part of the sales price when he sold various items of property. Indicia of bona fide loan business--the seeking out of customers, advertising, and the maintenance of a separate office--were absent from petitioner's loan business merely because of the unusual nature of his operations. Since the loan transactions giving rise to the first category of bad debts constituted the primary activity of petitioner's loan business, the proximate relation test of section 1.166-5(b), Income Tax Regs., is clearly satisfied. Accordingly, petitioners are entitled to a business bad debt deduction under section 166(a)(1) for losses sustained as a result of the worthlessness of loans made to bank customers and in connection with sales of property. The second category of bad debts was acquired by petitioner in a transaction in which seven individuals transferred $100,000 to the First National Bank of Braman, Oklahoma, in consideration for $229,000 in notes that had been classified as substandard or doubtful *419 by bank examiners. Petitioners maintain that Hugh Hutton's primary purpose in acquiring the notes was to service them in connection with his business of lending money. Respondent contends that the dominant motive underlying the transaction was the protection of petitioner's capital investment of $94,943.60 in the bank. In order to be entitled to deduct the losses on the debts as business bad debts, petitioners must show that Hugh Hutton's dominant motivation in acquiring the notes which gave rise to the bad debts in issue was business-related rather than investment-related. Generes,supra;Oddee Smith,60 T.C. 316 (1973). The issue is factual and each case must be decided on the facts presented in that case. We have reviewed the record in its entirety and conclude that petitioner's dominant motive in acquiring the notes was to service them in the ordinary course of his loan business. We are cognizant of the admonition of the Generes Court respecting a taxpayer's self-serving testimony as to the motives underlying a particular transaction. Objective facts surrounding the transaction, rather than subjective intent, control. Kelson v. United States,503 F.2d 1291 (10th Cir. 1974). *420 After analyzing the facts before us, we are convinced that petitioner has satisfied the dominant motivation test enunciated in Generes,supra.Of primary importance is the fact that the instant case involves a material factor not present in most of the bad debt cases involving shareholder-employees. Not only was petitioner a salaried employee of the bank, but he was involved in a continuous course of conduct of making loans, the purpose of which was the derivation of profit. Having made many of the loans in question as an officer of the bank and knowing, many, if not all of the borrowers, petitioner believed that he could collect a sufficient number of the past due notes so as to derive a profit from the transaction. The fact that hindsight reveals that his judgment was incorrect is immaterial. Furthermore, petitioner engaged in a practice of acquiring notes from the First National Bank of Braman whenever such notes were criticized by bank examiners. It is unlikely that acquisitions of small amounts of substandard notes prior to the time petitioner acquired control of the bank on January 1, 1968, were made to enhance the value of his stock. The acquisitions in issue differ *421 from the previous acquisitions only in the amount involved. Accordingly, we find that petitioners are entitled to a business bad debt deduction for the losses resulting from the notes acquired pursuant to the agreement of February 8, 1968. The third category of worthless debts was acquired by petitioner on the sale of his bank stock. Petitioners contend that the worthless notes constitute business bad debts, fully deductible from ordinary income. Respondent contends that the notes had no ascertainable value on the date of sale and therefore the "open" transaction doctrine of Burnet v. Logan,283 U.S. 404(1931), controls. The application of this rule, argues respondent, requires that the amount realized on the sale be computed by reference to the actual collections made on the notes received rather than their face amounts and that the business bad debt deductions claimed by petitioner be disallowed. We agree with respondent. Section 1.1001-1(a), Income Tax Regs., provides that "only in rare and extraordinary cases will property be considered to *422 have no fair market value." This case appears to present one of those rare and extraordinary situations, for the total amount of debts which would ultimately be collected could not be ascertained with reasonable certainty at the time of sale. Taxation of an "open" transaction is deferred only to the extent that the consideration received by the seller consists of property having no ascertainable value in the year of sale. In other words, recognized gain is computed as the difference between the consideration received having an ascertainable value and the basis in the property sold. Burnet v. Logan,supra;In re Steen,509 F.2d 1398 (9th Cir. 1975); Commissioner v. Carter,170 F.2d 911 (2d Cir. 1948); Stephen H. Dorsey,49 T.C. 606 (1968). Thus, the total amount realized by the petitioners on the transaction in the year of sale is the sum of the cash payment of $110,000, the two installment payments, and the debts actually collected in 1968. We do not find it necessary to reach the question of the character of the *423 bad debts, as it is wellsettled that a taxpayer is not entitled to a bad debt deduction under section 166 on the worthlessness of income items which have never been reported as income. Sec. 1.166-1(e), [6] Income Tax Regs.; Robert L. Gertz,64 T.C. 598 (1975). It follows that because the worthless debts in issue were never reported as income, petitioners are not entitled to a bad debt deduction under section 166.
Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
2. SEC. 166. BAD DEBTS. (a) GENERAL RULE.-- (1) WHOLLY WORTHLESS DEBTS.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * *
(d) NONBUSINESS DEBTS.-- (1) GENERAL RULE.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) NONBUSINESS DEBT DEFINED.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
3. SEC. 48(d) Certain Leased Property.--A person (other than a person referred to in section 46(d)(1)) who is a lessor of property may (at such time, in such manner, and subject to such conditions as are provided by regulations prescribed by the Secretary or his delegate) elect with respect to any new section 38 property to treat the lessee as having acquired such property for an amount equal to-- (1) except as provided in paragraph (2), the fair market value of such property, * * * ↩
4. SEC. 48(b) NEW SECTION 38 PROPERTY.--For purposes of this subpart, the term "new section 38 property" means section 38 property-- (1) the construction, reconstruction, or erection of which is completed by the taxpayer after December 31, 1961, or (2) acquired after December 31, 1961, if the original use of such property commences with the taxpayer and commences after such date. * * *↩
5. SEC. 48(c) USED SECTION 38 PROPERTY.-- (1) IN GENERAL.--For purposes of this subpart, the term "used section 38 property" means section 38 property acquired by purchase after December 31, 1961, which is not new section 38 property. Property shall not be treated as "used section 38↩ property" if, after its acquisition by the taxpayer, it is used by a person who used such property before such acquisition (or by a person who bears a relationship described in section 179(d)(2)(A) or (B) to a person who used such property before such acquisition).
6. Sec. 1.166-1(e) Prior inclusion in income required. Worthless debts arising from unpaid wages, salaries, fees, rents, and similar items of taxable income shall not be allowed as a deduction under section 166↩ unless the income such items represent has been included in the return of income for the year for which the deduction as a bad debt is claimed or for a prior taxable year.