HALLET E. WATSON and NANCY J. WATSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Watson v. Commissioner
Docket No. 12117-77.
United States Tax Court
T.C. Memo 1979-192; 1979 Tax Ct. Memo LEXIS 330; 38 T.C.M. (CCH) 810; T.C.M. (RIA) 79192; May 17, 1979, Filed Hallet E. Watson, pro se. Ruth E. Salek, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: This case was assigned to and heard by Special Trial Judge Lehman C. Aarons, pursuant to the *331 provisions of section 7456(c) of the Internal Revenue Code of 1954, [1] as amended, and General Order No. 6 of this Court, 69 T.C. XV. [2] The Court agrees with and adopts the Special Trial Judge's opinion which is set forth below. OPINION OF SPECIAL TRIAL JUDGE AARONS, Special Trial Judge: Respondent determined deficiencies in petitioners' federal income tax for 1973 and 1974 in the respective amounts of $836 and $382. With respect to 1973, petitioners filed a claim for refund (which was disallowed by respondent) and which was made a part of the petition herein. All issues raised by the pleadings have been conceded by petitioners with the exception of certain bad debts claimed, under section 166(a)(1) of the Code, as business bad debrs by the petitioners in their refund claim for 1973 and in their returns as a "miscellaneous deduction" for 1974. Respondent *332 concedes that the debts in question became worthless in the respective years, but maintains that they constituted nonbusiness bad debts. That is the only issue in this case. FINDINGS OF FACT Some of the facts are stipulated and are found accordingly. At the time of filing their petition the petitioners resided in South Gate, California. Since Nancy J. Watson is a petitioner herein only by virtue of having filed joint returns with her husband, the word "petitioner," as used herein in the singular, refers to Hallet E. Watson. In or about the year 1956 petitioner organized V and W Aircraft Castings, Inc. (V and W), a California corporation which operated an aluminum foundry. In December 1968 petitioner sold all the stock of V and W to Stellar Industries, Inc. (Stellar) for a total purchase price of approximately $370,000. The sales proceeds to petitioner, after a down payment of approximately 30%, were evidenced by a promissory note in the amount of $263,729.50. In the taxable years at issue a balance of approximately $160,000 remained due under a new note which, in 1970, had been substituted for the original promissory note. From the time of the sale of stock in 1968 *333 through the taxable years at issue petitioner was president of V and W and devoted his full time to that position. His salary was $27,035 in 1973 and $28,656 in 1974. Petitioner's employment agreement with V and W was for an original term ending October 31, 1971, and continuing thereafter, subject to termination by either party on 30 days notice. In March 1973 Stellar sold the V and W stock to Aeroceanic Corporation. Stellar had immediate problems thereafter in collecting the proceeds of that sale and in meeting the terms of its purchase obligation with petitioner. The sale to Aeroceanic was viewed with some alarm by V and W's creditors--in particular, the suppliers of the casting patters--and those creditors looked primarily to the credibility of petitioner for assurance in continuing to do business with V and W and in forbearing pursuit of their claims as creditors. In December 1969 petitioner had organized Jack A. Bennett Laboratories, Inc., a dental laboratory, hereinbelow referred to as Labs. Although petitioner's stock investment in Labs was small, he invested over $100,000 in Labs' equipment and plumbing and in loans to that corporation. Labs' business commenced *334 to go downhill, and in July 1972 petitioner sold all the outstanding Labs stock to one Steve Martin for a small fraction of petitioner's loans and capital contributions to Labs. In August 1972 petitioner loaned $4000 to Labs in an effort to save the failing business. Petitioner was guarantor of the debts of Labs to Bank of America and paid Bank of America $41,568.09 on account of such guarantee in 1973. Petitioner was also primarily liable for lease obligations of Labs, and in 1973 he paid $1049.50 to the lessor of the laboratory premises and $245.45 to an automobile leasing company in satisfaction of such liability. In February 1974 petitioner paid $1500 to Travelers Insurance Company, on behalf of Labs, pursuant to a California State Board of Equalizaiton sales tax bond. In September 1972 Labs and its new owners were forced into involuntary bankruptcy, and all their potential indebtedness to petitioner by virtue of any payments he would be required to make under his guarantees or direct liabilities became worthless. The above payments which petitioner was called upon to make on Labs' behalf were made by him for the purpose of preserving his credit status and his business *335 reputation. Had petitioner asserted legal defenses against, or otherwise resisted such payments, the suppliers and creditors of V and W might well have lost confidence in him and might have ceased doing business with V and W. If that had occurred, V and W's credit position would have been adversely affected, and the collectibility of the balance of the Stellar note, evidencing the sales price of petitioner's stock, would have been jeopardized. The continuance of petitioner's employment with V and W was a minor consideration in this picture. Petitioner's dominant motivation was maintaining the viability of V W until he could collect the balance due on the sale of his stock to Stellar. OPINION Even if we were to acknowledge fully the validity of petitioner's cause-and-effect rationale for the payments on Labs' behalf, there is simply no basis for treating these debts (which respondent concedes as worthless debts in the years claimed by petitioner) as anything other than nonbusiness bad debts. The path to this conclusion has been delineated clearly by the United States Supreme Court. Under Putnam v. Commissioner,352 U.S. 82 (1956), a guarantor's loss on a *336 payment under his guaranty, which gives him a right by subrogation against a principal debtor who is insolvent, becomes a worthless bad debt and is not deductible under any other section of the Code. The bad debt is deductible in full under section 166(a)(1) if it is a business bad debt. It is deductible as a short term capital loss under section 166(d) if it is a nonbusiness bad debt. Section 166(d)(2) defines "nonbusiness debt" as a debt other than one created or acquired in connection with the taxpayer's trade or business, or other than one the loss from the worthlessness of which is incurred in the taxpayer's trade or business. The Supreme Court in Whipple v. Commissioner,373 U.S. 193 (1963), made clear that the devoting of time and energy to the affairs of a corporation in order to obtain income or gain from an investment is not a trade or business for purposes of the 1939 Code predecessor of section 166. Under Whipple, a taxpayer who seeks to deduct as a business bad debt his worthless debts from a corporation (in that case a controlled corporation) must demonstrate that he was seeking more than an investor's return in making the loans or advances which *337 eventuated in the worthless debt. And the Court further held in Whipple that the fact that the taxpayer furnished management and other services to the corporation which he organized did not automatically convert his bad debts into business bad debts. Finally, in United States v. Generes,405 U.S. 93, (1972), the Supreme Court held that an individual who is both an investor and an employee who advances funds to his corporation can deduct the amount of the debt as a business bad debt only if his "dominant motivation" was to protect his trade or business (i.e. his employment) rather than his investment. Petitioner herein negated the protection of his position as president of V and W as his dominant motivation. Even had he asserted that he was thus dominantly motivated, the disparity in the amounts of his salary (around $28,000) and his investment stake in V and W (around $160,000), coupled with the month-to-month term of his employment, would have negated such contention. Applying the measure prescribed for us in Generes, we conclude that petitioner's dominant motivation in paying (either as guarantor or as direct obligor) the debts of Labs was an investor's *338 motivation (i.e. collecting the proceeds of his sale of the V and W stock) and not a trade or business motivation within the meaning of section 166 of the Code. In accordance with the foregoing, Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted. ↩
2. Pursuant to General Order No. 6 dated March 8, 1978, the post-trial procedures set forth in Rule 182 of this Court's Rules of Practice and Procedure are not applicable to this case.↩