BERNARD J. LIEBMANN and MARY M. LIEBMANN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Liebmann v. Commissioner
Docket No. 5772-77.
United States Tax Court
T.C. Memo 1979-399; 1979 Tax Ct. Memo LEXIS 119; 39 T.C.M. (CCH) 248; T.C.M. (RIA) 79399; September 25, 1979, Filed Robert R. Rydell, for the petitioners. J. Anthony Hoefer, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar years 1973 and 1974 in the amounts of $1,410 and $3,046, respectively. The issue for decision is whether petitioners are entitled *120 to a business bad debt deduction in 1973 or 1974 because of the worthlessness of loans made by petitioner Bernard J. Liebmann to his WHOLLY OWNED CORPORATION, Liebmann Transportation Co., Inc., or for payments on a bank loan to that corporation assumed by Mr. Liebmann as guarantor. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in Perry, Iowa at the time of the filing of the petition in this case, filed joint Federal income tax returns for the calendar years 1973 and 1974.Petitioners' returns were prepared on the cash basis of accounting. Bernard J. Liebmann (petitioner), immediately upon his graduation from high school, began working for a corporation, Liebmann Packing Co. (the packing company), the stock of which was owned by his family. He continued his employment in this corporation until it ceased its production operations. At that time petitioner was 49 years old. The packing company conducted its business operations in Green Bay, Wisconsin and petitioner and his family lived in Green Bay. Petitioner was the general manager of the packing company at the time it ceased meat production *121 and was responsible for the packing company's transportation needs both by rail and by truck. At the time the packing company ceased production of meat products in mid-1970, petitioner leased, on behalf of the company, the transportation equipment which the company owned to various motor carriers who had operating rights in interstate commerce under agreements whereby the packing company received 90 percent of the transportation costs paid to the carriers and the carriers retained 10 percent. Effective July 1, 1971, petitioner incorporated a Wisconsin corporation, Liebmann Transportation Co., Inc. (the corporation). On August 4, 1971, the Iowa Secretary of State authorized the corporation to transact business in Iowa from that date. The corporation leased the transportation equipment owned by the packing company and continued leasing this equipment to motor carriers as petitioner had done on behalf of the packing company. The corporation actually began operation upon its incorporation on July 1, 1971. Petitioner invested $20,000 in the corporation and all the corporate stock was issued to him. On July 1 he was elected president and treasurer of the corporation and his wife, *122 Mary M. Liebmann, was elected secretary. The stock of the corporation issued to petitioner consisted of 200 shares. Petitioner's entire business experience was in the meatpacking and distribution business. At the time the packing company shut down, Green Bay, Wisconsin was a community of approximately 82,000 inhabitants. Petitioner was born in 1921 and in July 1971 was 50 years old. At that time he had a wife and seven children.
Shortly after its incorporation, the corporation applied for Interstate Commerce Commission (ICC) licenses to transport meat products from the midwestern states to various eastern states. With such a license the corporation would not be required to pay the 10 percent to other carriers who had a license to operate but could retain the entire amount of revenues from the transportation of products. The corporation acquired its first ICC license in October 1971, effective as of November 5, 1971. Thereafter the corporation was engaged in the business of hauling meat by truck from packing houses in Nebraska, Iowa, Minnesota and Kansas to various eastern and mid-western states. Payment to the corporation for the cost of transporting meat was due each *123 7 days. The charges for fuel used by the corporation for its transportation equipment were generally due the 15th day of the month following the receipt of the bill. Petitioner's payroll was paid at the end of each week. In the first 6 months of operation the corporation grossed approximately $700,000 and in its first year of operation grossed approximately $1,750,000. At the initial meeting of the board of directors of the corporation the matter of moving the operation to Iowa Falls, Iowa was considered and authorized. Thereafter the operation was moved to Iowa Falls. The expenses for the first year of operation included start-up and relocation expenses. During this first year there were repairs made to the equipment which at times necessitated the equipment remaining idle. Commencing on July 31, 1971, petitioner began advancing money to the corporation. These advances were documented by notes. The following schedule shows the dates of these advances and the amounts thereof: Date
Amount
July 31, 1971
$32,000
August 17, 1971
35,000
October 22, 1971
15,000
December 13, 1971
20,000
January 25, 1972
25,000
March 14, 1972
10,000
July 6, 1972
52,000
February 8, 1973
5,000
February 14, 1973
12,000
April 20, 1973
5,000
*124 The first two of these advances were made at the time the business was being moved from Green Bay, Wisconsin to Iowa Falls, Iowa. Some of the loans made by petitioner to the corporation were at the time the corporation was making extensive repairs on its transportation equipment and having some of its transportation equipment reconditioned. The moneys loaned by petitioner to the corporation went for operating expenses of the corporation. Petitioner obtained the money he lent to the corporation either from the cash surrender value of insurance policies which he had on his life or by borrowing on this cash surrender value from the insurance company. On November 29, 1971, the corporation entered into an agreement to lease from Ashburn Equipment Co. 34 tractors and 43 trailers for a period of 48 months. Most of these tractors and trailers were the same equipment which petitioner had previously leased from the packing company. This equipment had been sold by the packing company to Ashburn Equipment Co. The lease agreement granted the corporation an option to buy the leased equipment. The corporation's liability under this contract was payable in monthly installments of $10,905. *125 Its total liability under the agreement as of December 1, 1971, was $545,186.64. Petitioner personally guaranteed the corporation's liability under the lease-purchase agreement and assumed responsibility and liability for the performance of the lease by the corporation. The corporation acquired the stock of another carrier, Morton Truck Lines, Inc., effective in May of 1972. Under the terms of this acquisition the corporation agreed to lend to Morton Truck Lines, Inc. $70,000 of operating funds. The total purchase price of the stock of the corporation was $121,807.40, payable $30,333.30 down and the balance at $1,000 a month. The corporation borrowed the $70,000 which it agreed to lend to Morton Truck Lines, Inc. from the Citizens State Bank of Iowa Falls, Iowa. On December 28, 1972, the corporation obtained a loan from Citizens State Bank of Iowa Falls, Iowa with participation of the Small Business Administration in the amount of $300,000. Petitioner guaranteed repayment of this loan. Citizens State Bank of Iowa Falls retained the $70,000 which the corporation owed to it on the prior loan from the proceeds of the $300,000 Small Business Administration loan which was guaranteed *126 by petitioner. The ICC certificates held by Morton Truck Lines, Inc. and its operation which was primarily in hauling meat products complemented the corporation's operations and expanded the area of its operations. Because of high equipment maintenance cost and other operating difficulties, the corporation began in its first year of business to experience deficits. The following schedule shows the total assets, total liabilities, deficits in accumulated earnings and deficits in stockholders equity of the corporation at the dates indicated as shown by unaudited financial statements prepared by the corporation's accountant: Period Ending
July 31,
Dec. 31,
June 30,
1971
1971
1972
Total Assets
$155,224.18
$818,062.08
$1,235,788.67
Total Liabilities
156,239.20
857,959.96
1,324,381.37
Retained Earnings
(Deficit)
(21,015.02)
(59,897.88)
(108,592.70)
Stockholders Equity
(Deficit)
(1,015.02)
(39,897.88)
(88,592.70)
Period Ending
Dec. 31,
Feb. 28,
1972
1973
Total Assets
$1,221,047.70
$1,129,838.35
Total Liabilities
1,509,550.70
1,531,631.37
Retained Earnings
(Deficit)
(308,503.00)
(421,793.02)
Stockholders Equity
(Deficit)
(288,503.00)
(401,793.02)
*127 In May of 1973, the corporation executed a trust security agreement to a trustee for a creditors' committee and in the late summer of 1973 an auction was held to dispose of all the assets held by the corporation except the ICC rights and the Morton Truck Lines, Inc. stock. The auction was under the control of the trustee for the creditors. In October of 1973, the corporation conveyed to the trustee for the creditors' committee all of its assets. This type of arrangement was agreed to by the corporation's creditors and after all the assets of the corporation were distributed to the various creditors the corporation ceased to operate and was subsequently dissolved by operation of law.
Mary M. Liebmann, petitioner's wife, purchased from the trustee for the creditors' committee the stock in Morton Truck Lines, Inc. owned by the corporation by paying the sum of $23,439 which was distributed to the creditors and assuming the corporation's indebtedness due on the purchase of the stock. Petitioner at the time of the trial of this case was president and chief operating officer of Morton Truck Lines, Inc. His wife still owned all the stock of Morton Truck Lines, Inc. The following schedule *128 is a summary of the gross income as reported by petitioners on their individual Federal income tax returns for the years indicated: Bernard J. and Mary M. Liebmann SUMMARY OF GROSS INCOME AS REPORTED ON INDIVIDUAL FEDERAL INCOME TAX RETURNS Years
1970
1971
1972
1973
Salaries
Liebmann Packing Co. (A)
$19,370 $ $ $
The Emel Corporation (A)
10,000
Liebmann Transportation Co.
14,423
9,000
5,600
Morton Truck Lines
57,754
Total
29,370
14,423
9,000
63,354
Interest Income
Insurance policies
1,108
557
513
185
K. C. Trust (A)
2,240
2,829
840
71
Savings account
2,129
2,025
1,146
Liebmann Transportation
5,488
Morton Truck
Internal Revenue Service
Dividend
Langlade Operating Co. (A)
Sale of Property (reported at 50%)
Sale of Katy
(651)
Sale of Emel (A)
750
624
66
Sale of Wisconsin Rendering (A)
6,719
5,198
From partnership (A)
1,153
8,669
From trust (A)
2,900
Sale of Langladed Operating (A)
Partnerships & Trusts
Preble Operating Ltd. (A)
11,346
2,968
3,695
(13,885)
Other (A)
19
Miscellaneous
State tax refunds
1,097
204
Other
Total gross income
$44,163
$25,799
$28,550
$67,638
*129 Years
1974
1975
1976
1977
Salaries
Liebmann Packing Co. (A) $ $ $ $
The Emel Corporation (A)
Liebmann Transportation Co.
Morton Truck Lines
39,000
34,075
30,940
30,593
Total
39,000
34,075
30,940
30,593
Interest Income
Insurance policies
740
489
535
514
K. C. Trust (A)
Savings account
1,275
511
989
Liebmann Transportation
Morton Truck
3,432
Internal Revenue Service
813
Dividend
Langlade Operating Co. (A)
1,650
3,300
3,300
Sale of Property (reported at 50%)
Sale of Katy
Sale of Emel (A)
Sale of Wisconsin Rendering (A)
From partnership (A)
From trust (A)
Sale of Langlade Operating (A)
7,926
Partnerships & Trusts
Preble Operating Ltd. (A)
3,242
1,896
779
Other (A)
Miscellaneous
State tax refunds
Other
34
Total gross income
$50,152
$40,305
$43,480
$32,096
A=Part of family business or related thereto which were being liquidated. (1) Commission of $20,000 orginally reported on 1971 return in error. Corrected by amended return. 2) Payments made to SBA.$43,936 $ 3,835 $23,834 $6,000 When the corporation first commenced operation petitioner was paid at the rate of $576.92 a week, *130 which annualized would result in a salary of $30,000. However, as shown by the preceding schedule, the total amount petitioner received as salary in 1971 from the corporation was $14,423 and the total amounts he received in 1972 and 1973 were $9,000 and $5,600, respectively. After the corporation's assets were liquidated, the corporate notes due petitioner remained unpaid and a balance remained unpaid on the corporation's Small Business Administration loan from the bank. Petitioner was repaid none of his loans to the corporation and petitioner was required to assume payment on the corporation's debt to the bank. Petitioner has continued to pay on this indebtedness. On petitioners' 1973 Federal income tax return they claimed a deduction for a "Loss on investment Liebmann Transportation Co. Inc." of $236,921 which included the $159,000 of loans to the corporation that had become worthless in that year and $46,634 of principal payments on the corporation's debt to the bank assumed by petitioner. On their 1974 Federal income tax return petitioners claimed a deduction of $28,689 of principal payment on the corporation's debt to the bank assumed by petitioner and an operating *131 loss carry-forward based on petitioners' 1973 loss on loans petitioner had made to the corporation and his 1973 payment on the corporation's bank debt. In his notice of deficiency respondent determined that petitioners' losses on the loans to the corporation and the payment on the corporation's debt to the bank were losses from nonbusiness bad debts and therefore to be considered as short-term capital losses. Respondent in 1974, for this reason, disallowed the claimed net operating loss carryforward. OPINION Section 166(a), I.R.C. 1954, [1] provides for a deduction by a taxpayer of any debt which becomes worthless within the taxable year.However, section 166(d)[2] provides that in the case of a taxpayer other than a corporation the loss from a nonbusiness debt which becomes worthless within the taxable year shall be considered as a short-term capital loss deductible only to the extent provided for in section 1211. A nonbusiness debt is defined in the statute as a debt other than one created or acquired in connection with a trade or business of the taxpayer or the loss from the worthlessness of which is incurred in the taxpayer's trade or business. In Whipple v. Commissioner,373 U.S. 193, 202 (1963), *132 the Court pointed out that the trade or business of a corporation is not the trade or business of the stockholder-taxpayer and that-- care must be taken to distinguish bad debt losses arising from his own business and those actually arising from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business. Therefore, for a loan to be a business debt of a stockholder of a corporation the stockholder must show its relationship to his own business as distinguished from the corporate business. *133 Section 1.166-5(b), Income Tax Regs., provides that the question of whether a debt is a nonbusiness debt is one of fact in each particular case. This regulation further states that the determination of whether the loss from a worthless debt has been incurred in the trade or business of the taxpayer shall be determined by the relationship which the loss resulting from the debt becoming worthless bears to the trade or business of the taxpayer. If the relationship is a proximate one in the conduct of a trade or business in which the taxpayer is engaged, the debt is a business bad debt. Here it is clear that the loans made by petitioner to the corporation and the debts guaranteed by petitioner for the corporation were to provide the corporation with operating funds. Petitioner, however, contends that the loss from the worthlessness of his loans and his payments under his guarantee were incurred in his trade or business of being an employee of the corporation. Petitioner argues that he made these loans in order to protect his employment by the corporation and the salary he received from this corporation. It has been recognized in such cases as Trent v. Commissioner,291 F.2d 669 (2d Cir. 1961), *134 that being a corporate employee may be a trade or business of a taxpayer for the purpose of section 166. When a taxpayer is both an officer and a shareholder of a corporation to which he makes loans, it is necessary to determine whether the loans are proximately related to petitioner's trade or business of being a corporate employee as distinguished from his interests as an investor in the corporation. In United States v. Generes,405 U.S. 93 (1971), the Court pointed out that where loans are made to a corporation by an individual who is both a stockholder and an employee or corporate loans are guaranteed by such an individual, generally there will be the dual motive in the making or guaranteeing of the loans of protecting investment and protecting salary. The Court then concluded that in order to show that a worthless debt is incurred by a taxpayer in his trade or business of being an employee, the taxpayer must show that his dominant motivation in making the loan was to protect his salary and status as an employee as distinguished from protection of his investment in the corporation. Here petitioner testified that he made the loans to the corporation to protect *135 his employment by the corporation. He stated that all his working life he had been employed by his family-owned business and that he did not believe there was available other work in Green Bay, Wisconsin comparable to the work he had been doing for the family-owned business. However, as was pointed out in United States v. Generes,supra, such statements as those of petitioner in this case are self-serving and it is necessary to analyze them in the light of all the other facts surrounding the making of the loans to determine from the evidence the petitioner's dominant motivation in making the loans. In the Generes case the Court compared the taxpayer's annual salary which was paid in before-tax dollars to his original investment in the corporation in after-tax dollars, plus his loan to the corporation. In that case the Court also quoted the statement from the Whipple case to the effect that a sole stockholder of a corporation might find it difficult to furnish evidence that the loan was necessary to keep his job. Certainly in the instant case petitioner was not required to make the loans to the corporation or to guarantee the corporate loan in order *136 to keep his position with the corporation as long as the corporation was financially able to operate without money received from his loans. Petitioner contends the corporation's ability to continue in business depended on his loans to it and his guaranteeing its loan. Petitioner concludes that for this reason the loans and guarantee were necessary in his business of being a corporate employee. However, the business of being a corporate employee is to be distinguished from being employed by a particular corporation. The instant case is distinguishable from those cases in which a corporate employee makes a loan to a corporation in which he has no or little investment interest. A taxpayer who is the sole stockholder of a corporation to which he lends money necessarily has both the motive of protecting an investment and of keeping employment with his corporation. Which of the motives is dominant must be determined from the objective facts. In the instant case petitioner received salaries of $14,423, $9,000 and $5,600 for the years 1971, 1972 and 1973, respectively, from the corporation as compared to the direct loans totaling $159,000 which he made to the corporation and the $300,000 *137 loan which he guaranteed. It is true that petitioner's major employment was with this corporation and the other income he received was from family-owned businesses which were being liquidated. The facts also show that initially the corporation was paying petitioner at the rate of $30,000 a year but soon reduced these salary payments. The reduced salary accepted by petitioner as compared to loans made to or guaranteed for the corporation of $459,000 is indicative that petitioner's dominant motive for the loans and guarantee was not the salary he drew but rather his interest as an investor in the corporation. See Putoma Corporation v. Commissioner,66 T.C. 652, 673-674 (1976). Petitioner, in addition to the $459,000 of loans to the corporation made to or guaranteed by him, was a guarantor on the lease-purchase agreement of petitioner's revenue producing equipment. Petitioner stresses that his initial investment in the corporation was only $20,000. However, shortly after its incorporation petitioner began advancing moneys to the corporation and, as pointed out in the Generes case, these loans and guarantees of loans must be considered as an investment which needs *138 to be protec ted when determining the dominant motivation for a loan under section 166. Petitioner did not testify that he was unemployable or could not have obtained employment equal to or better than his position with the corporation in areas outside of Green Bay, Wisconsin. If we accepted his testimony, which as heretofore pointed out is self-serving, that there was not adequate employment for him in the Green Bay area, this would lend little strength to his contention that maintaining his employment was his dominant motive in making loans to the corporation or guaranteeing its loans. Shortly after the corporation was organized it moved its headquarters to Iowa Falls, Iowa and petitioner and his family moved to Iowa Falls, Iowa.There is certainly no showing in this record that petitioner could not have obtained employment comparable to that he had with the corporation outside the Green Bay area.See Putoma Corporation v. Commissioner,supra.
Considering all the evidence in this record, we conclude that petitioner's dominant motive in making loans to the corporation was not to protect his employment with the corporation but was to protect his investment. *139 Hoover, Jr. v. United States,     F.2d     (6th Cir. July 27, 1977, 77-2 USTC par. 9701, 40 AFTR 2d 77-6044). The loans made by petitioner to the corporation and the payments he made on the corporate loans in accordance with his guarantee, were not losses from the worthlessness of a business bad debt. Rather these losses resulted from the worthlessness of a nonbusiness bad debt.
Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated. ↩
2. Section 166(d) provides as follows: SEC. 166. BAD DEBTS. * * * (d) Nobusiness Debts.-- (1) General rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting there-from shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩