# IN THE OREGON TAX COURT

ROMANI et al,
fka Lilly

*v.*

DEPARTMENT OF REVENUE

(TC 2230)

Lynn H. Heusinkveld, Coos Bay, represented plaintiffs.

Jerry Bronner, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for plaintiffs rendered April 30, 1985.

**CARL N. BYERS, Judge.**

Plaintiffs appeal from an order of the Department of Revenue denying a claimed bad debt loss on their 1981 income

tax return. The facts giving rise to this appeal are largely undisputed.

Prior to 1976, Linda Romani (hereinafter "Linda") was married to Robert Lilly with whom she had two children. In 1976, Robert Lilly purchased a men's clothing store known as "Justin's Store for Men" located in North Bend, Oregon. The business was incorporated and all of the stock was purchased in Robert Lilly's name. Robert Lilly became the President of the business. Linda was named as the Secretary-Treasurer. Both Linda and Robert Lilly worked in the store. Presumably he was the manager and worked there full time. Linda testified that she worked there when she could, since she had other duties at home raising the children. Initially she was employed working the floor and in the gift wrapping section. Later her duties expanded to include those of book-keeper, tailor and clerk.

In order to obtain operating capital for the business, Robert Lilly arranged for the corporation to borrow from a local bank. In connection with that loan, both Robert Lilly and Linda signed individual continuing guarantees. It is Linda's payment under that guarantee which gives rise to the loss in question.

Apparently the clothing store business enjoyed some period of success. However, Robert Lilly's weakness for alcohol and gambling began to dominate his life. As his ability to respond to his duties diminished, Linda was compelled to assume an increasing degree of control of the business. By the spring of 1979 it became apparent that Robert Lilly required treatment for alcoholism. In preparation for Robert Lilly's absence, the corporation passed a resolution authorizing Linda, as well as Robert Lilly, to borrow money for the operations of the corporation. Robert Lilly then committed himself to a private alcohol treatment center. During the time Robert Lilly was absent, and for most of the time after his treatment until the demise of the store, Linda wholly managed and operated the store. While Robert Lilly was absent undergoing treatment for alcoholism, Linda continued to have a check drawn for his salary, which was deposited in the family joint checking account. During this time, Linda signed all checks, both for the business and for the family, and paid all bills. Thereafter, both the business and personal relationship of the

parties continued to deteriorate and by 1980 the parties had commenced divorce proceedings. In the fall of that year, the bank demanded payment on the corporation's promissory note. With the consent of Robert Lilly and Linda, the bank took possession of and sold the inventory and assets of the corporation. The proceeds from the sale of the corporate assets were insufficient to satisfy the bank debt. Shortly before this, Linda and her husband Robert Lilly finalized their divorce.

The bank then made an effort to collect the deficiency judgment from Robert Lilly. However, although utilizing its resources to skip trace, perform property searches and investigate the employment and credit status of Robert Lilly, it was unable to ascertain that he had any ability or assets with which to pay the deficiency. It then made demand upon Linda who owned a personal residence subject to a mortgage. Linda eventually negotiated terms with the bank and conveyed the personal residence to the bank in satisfaction of the deficiency arising out of the corporate debt as well as some other obligations.

The two main issues in this case are:

(1)   Whether the loss arose out of Linda's trade or business and therefore qualifies as a business bad debt; and

(2)   Whether the debt to Linda in fact became entirely worthless in 1981 and was therefore subject to deduction.

■   The deductibility of losses arising from guarantee agreements is governed by Reg. § 1.166-9 (applying to guarantee agreements entered into after December 31, 1975). One of the initial conditions to be met by the taxpayer in qualifying under that regulation is that the agreement be entered into "in the course of their trade or business." The three possibilities or categories are as follows:

(a)   A transaction entered into in the course of trade or business, in which case the loss therefrom is completely deductible;

(b)   A transaction entered into for profit but not in the course of a trade or business, in which case any loss therefrom is deductible on a limited basis; and

(c)   A transaction entered into for reasons other than profit, trade or business, in which case the loss therefrom is not deductible at all.

Although the above three are the possible categories, the statute and regulations focus on the distinction between business and nonbusiness debts. The issue of whether a debt is a nonbusiness debt is a question of fact to be determined in each case. Reg. § 1.166-5(b) defines a nonbusiness debt. The regulation provides in part that:

> "[T]he character of the debt is to be determined by the relation which the loss * * * bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt comes within the exception provided by that subparagraph." Reg. § 1.166-5(b)(2).

The "proximate" relationship required by the regulation has been construed by the courts to mean the "dominant motivation" of the taxpayer. *United States v. Generes,* 405 US 93, 92 S Ct 827, 31 L Ed 2d 62 (1972). Thus, the initial question which must be answered is what was Linda's dominant motivation for executing the guarantee agreement in this case?

Defendant contends that Linda's dominant motivation was domestic tranquility. Defendant reasons that Linda would not sign a guarantee agreement for $50,000 to the bank merely to protect a job which paid her $2,000 per year. Since she was the wife of the sole shareholder of the corporation whose debt was being guaranteed, her dominant motivation must have been to please her husband Robert Lilly.

While defendant's contention is based on common human experience, it is not supported by the evidence in this case. The disparity between the amount of the guarantee and Linda's salary is mitigated on two points. First, the evidence indicates that Linda was told that the guarantee was just a formality and that she would not be held liable. It is apparent to the court that at the time the agreement was executed, Linda was unsophisticated in financial matters and did not fully appreciate the significance of the guarantee agreement. Further the court is persuaded that Linda viewed her job as part of the family business. As such, she was content to receive

only $2,000 salary per year because of the other benefits received in the form of her husband's salary, the health insurance received by her family and the country club membership provided her family by the corporation.

Second, Linda testified that she believed Robert Lilly would not be angry if she refused to sign the guarantee, but that she had signed it to keep the store going and thought it "a good idea." Based on the evidence adduced, the court is persuaded that Linda's dominant motive did not arise from the heart as contended by defendant but from the pocketbook. In other words, her basic motivation was financial in nature.

In attempting to consider Linda's state of mind, the court must consider all of the circumstances present. Probably the real impetus for the agreement being signed was the fact that the bank wanted the wife of the corporation's only shareholder to sign. However, the bank's motivation is not relevant. Linda testified that she signed the agreement because of her job. As stated in Defendant's Exhibit B, a letter written by Linda to the Department of Revenue, she stated, "I had to guarantee the note as a condition of employment, so that I might keep my job as bookkeeper and secretary." However, on cross-examination, she admitted that her husband Robert Lilly probably would not have fired her if she had refused to sign the agreement. She apparently did understand, however, that if she did not sign the guarantee agreement, possibly there would be no store and therefore no job.

The vast majority of cases dealing with "dominant motivation" for bad debt losses, are concerned with distinguishing the shareholder/employe's investment motivation from his trade or business motivation. In this case, Linda was not a shareholder of the corporation and therefore had no investment motivation.[1] If Linda did not have an investment interest in the business and her motive was financial rather than personal as the court has concluded, then her dominant motivation or intent must have been to preserve the interest that she did have, i.e., a job. This was subsequently borne out when her husband Robert Lilly became a detriment to the

---

[1] It would appear that the family attribution rules found in various provisions in the Internal Revenue Code, such as section 267 and section 318 do not apply to section 166 and cases arising thereunder.

business, himself and the family. At that time, she apparently had to choose survival over domestic tranquility and worked to the full extent of her capacity to "keep the store going."

The court cannot ignore the corporate entity present in this case. It is the corporation which employed Linda and provided for her family. Undoubtedly, her employment with and service rendered to the corporation was not fully reflected in her salary. However, as expressed by the court in *Anderson v. United States,* 555 F2d 236, 238 (9th Cir 1977), 40 AFTR2d 77-5242:

> "Money is not the sole measure of a job's remuneration."

In the circumstances of this case, the court finds that Linda's dominant motivation for executing the guarantee agreement was to protect her employment, which might otherwise terminate if the store was unable to borrow operating capital.

■ Subsection (a) of Reg. 1.166-9 indicates that in order for a loss to be deductible, it must also meet the requirements of paragraphs (c), (d) and (e) of that section. Defendant contends that subsection (e) is applicable and denies Linda the tax deduction. Subsection (e), entitled special rules—(1), requires that the taxpayer have received "reasonable consideration" in exchange for acting as a guarantor, endorser or indemnitor. The section then provides:

> "For purposes of this paragraph (e)(1), reasonable consideration is not limited to direct consideration in the form of cash or property. Thus, where a taxpayer can demonstrate the agreement was given without direct consideration in the form of cash or property but in accordance with normal business practice or for a good faith business purpose, worthless debt treatment is allowed with respect to a payment in discharge of part or all of the agreement if the conditions of this section are met. However, consideration received from a taxpayer's spouse or any individual listed in section 152(a) must be direct consideration in the form of cash or property."

Defendant contends that the consideration received by Linda came from her husband Robert Lilly and therefore direct consideration in the form of cash or property is required. However, Linda did not guarantee her husband's bank debt. She guaranteed the corporation's debt and the

consideration therefor came from the corporation. Consequently, the reasonable consideration required does not have to be direct in the form of cash or property. In this case, Linda has demonstrated that in addition to the direct consideration of $2,000 salary per year, she received benefits from her husband's salary, health insurance for her family and membership in a local country club. All of this, in the court's view, constitutes "reasonable consideration" for the amount of the guarantee agreement which she executed.

The second issue in this case is whether the debt became worthless in the year 1981. It is important to understand the legal relationship of the parties involved. When Linda paid the deficiency to Western Bank, Linda then became subrogated to the right of the bank to collect from the corporation. The evidence establishes that in November 1980 the bank had repossessed all of the corporate assets and had sold them for an amount which left a deficiency owing. By letter dated November 24, 1980, the bank made demand on Linda for payment of this deficiency under the guarantee agreement. The amount of the loss as to Linda was not fixed until April 30, 1981, when she conveyed the house to the bank in satisfaction of the debt. At that point it was apparent to any reasonable person that the corporation was totally without assets and unable to pay the debt. Thus, there is no question that the debt which arose as to Linda in 1981 was in fact worthless. However, since Robert Lilly also guaranteed the corporate debt, Linda is entitled to contribution from Robert Lilly. In order to deduct the entire amount of the loss, Linda must establish that the obligation of contribution for one-half running from Robert Lilly is also worthless. Reg. § 1.166-9(e)(2).

Subsequent to her divorce from Robert Lilly in 1980, Linda married Romano Romani with whom she filed a joint income tax return for the calendar year 1981. Linda testified that by 1981 Robert Lilly had lost all of his known assets except perhaps an old car and was living with his mother in Florida. Robert Lilly was extremely difficult to locate and when he was located was often found living on "skid row." This testimony was collaborated by the experience of the bank which also tried to locate and collect money from Robert Lilly. Finally, there is some evidence that both the Department of Revenue and the Internal Revenue Service were attempting to

collect unpaid payroll taxes from Robert Lilly and were unsuccessful. The Department of Revenue's witness declined to comment on this by reason of the statutes pertaining to confidentiality of income tax information. The department's witness did make it clear, however, that she believed significant documentary evidence must be produced by a taxpayer in order to establish that the debt is worthless. The statute and regulations impose no such requirement. Reg. § 1.166-2.

The income tax laws place the risk and decision on the taxpayer to choose the year in which a debt becomes worthless. If the taxpayer decides too early that a debt is uncollectible, the deduction will be disallowed and the taxpayer may claim the deduction in a later year. However, if the taxpayer claims a later date and it turns out that the date should have been sooner, the taxpayer may be foreclosed of a deduction by virtue of a statute of limitations. On the other hand, if a taxpayer deducts a worthless debt and the debt is later collected, the amount is included in the taxpayers's ordinary income in the year collected.

Under these circumstances, although the taxpayer has the burden of proving that the debt became worthless in the year claimed, the taxpayer is not required to be "an incorrigible optimist." *United States v. S.S. White Dental Manufacturing Co.*, 274 US 398, 403, 47 S Ct 598, 71 L Ed 1120 (1927). It is not necessary here to recite all of the different cases in which the courts have held that the creditor need not take futile or useless action to establish that a debt was worthless. In this case the evidence was that Robert Lilly had increasing alcohol and gambling problems which led to the loss of his family, his property, his business and apparently his self-respect. Linda has been unable to collect the full amount of child support due to her and has trouble locating Robert Lilly. These facts may cause a reasonable person to conclude that it is likely that Robert Lilly will probably never pay this debt. In these circumstances, Linda is not required to incur the expense of obtaining a judgment or other documentation to establish that Robert Lilly is unable and will remain unable to pay the debt. Debts are worthless "when there are reasonable grounds for abandoning any hope of repayment in the future." *Dallmeyer v. Commissioner*, 14 TC 1282, 1292 (1950).

The court therefore finds that taxpayer was entitled

to a deduction for the claimed bad debt loss as shown on the income tax return for 1981. The Department of Revenue's Opinion and Order No. I 84-246 is hereby set aside and held for naught. Plaintiffs to recover reasonable attorney's fees and costs.

## OPINION ON COST BILL

Subsequent to the trial in this case, plaintiffs submitted their cost bill, including a claim for reasonable attorney fees and expert witness fees. Defendant submitted timely objections supported by memorandum. Counsel for plaintiffs has submitted memorandum and defendant additional points and authorities.

The objections and arguments submitted make it appropriate for the court to review the awarding of attorney fees under ORS 305.490(2).[1] Under that statute, the court is

---

[1] "(2) If, in any proceeding under this section involving taxes upon or measured by net income in which an individual taxpayer is a party, or involving gift or inheritance taxes, the court grants a refund claimed by the executor or taxpayer or denies in part or wholly an additional assessment of taxes claimed by the department to be due from the estate or taxpayer, the court may allow the taxpayer, in addition to costs and disbursements:

"(a) Reasonable attorney fees for the proceeding under this section and for the prior proceeding in the matter, if any, before the department; and

"(b) Reasonable expenses as determined by the court. Expenses include accountant fees and fees of other experts incurred by the executor or individual taxpayer in preparing for and conducting the proceeding under this section and the prior proceeding in the matter, if any, before the department.

"Payment of attorney fees or reasonable expenses shall be made by the department in the manner provided by law for the payment of income tax refunds."

given discretionary authority to allow both reasonable attorney fees and reasonable expenses to a prevailing individual taxpayer. The statute does not provide guidelines or standards for the exercise of the court's discretion. Defendant points out that the statutory authority is similar to the authority granted the Court of Appeals under ORS 183.495. *Brown v. Adult and Family Services,* 293 Or 6, 643 P2d 1266 (1982). Defendant argues that the guidelines established by the Court of Appeals for awarding attorney fees under ORS 183.495 should be followed by this court in awarding attorney fees under ORS 305.490(2).

There is a basic difference between the Tax Court and the Court of Appeals. The statute which controls the authority of the Court of Appeals to reverse or remand a final order of a state agency, ORS 183.482, provides different standards for review. *See Van Gordon v. Ore. State Bd. of Dental Examiners,* 63 Or App 561, 666 P2d 276 (1983). In addition, it should be recognized that the agency actions reviewed by the Court of Appeals cover a wide variety of governmental powers and not merely the assessment of taxes. The policy reasons for awarding attorney fees in a dispute over a license revocation may be entirely different from the reasons for awarding attorney fees in a dispute over income taxes.

The legislative history of ORS 305.490(2) provides little guidance to the court for the exercise of its discretion. The initial proposal found in House Bill 1002 in the 1971 regular session provided that the Tax Court "shall" allow attorney fees and expenses to a prevailing party in an income tax dispute. That section was subsequently amended and the "shall" was changed to "may," thereby making the award discretionary. It may be inferred from this change that the legislature did not intend that attorney fees be awarded in every case. When or why fees should or should not be awarded are questions left to the court to answer. While attorney fees and reasonable expenses have been awarded in several cases, no standards have been established by the court in those cases.

Following the example of the Court of Appeals in *Van Gordon v. Ore. Bd. of Dental Examiners, supra,* the court believes that the Department of Revenue and the public will benefit by now setting forth guidelines for the awarding of

attorney fees and expenses under ORS 305.490(2). It is emphasized that these are guidelines only and may be modified, enlarged or deleted as the circumstances of the cases may indicate appropriate.

Generally the court will award attorney fees under ORS 305.490(2) in cases where it appears that the Department of Revenue has taken an arbitrary or unreasonable position in interpreting the law or construing the facts. Likewise, where the law, regulation or tax forms are ambiguous or unclear, the court will award attorney fees and expenses since the resulting clarification is for the benefit of the public in general. The court will also be inclined to grant attorney fees in cases where it appears just and equitable.

Generally the court will not award attorney fees and expenses where: (a) the taxpayer fails to furnish complete and adequate information to the department as requested or required by law, (b) the taxpayer is uncooperative or lacking in candor in attempting to bring all relevant facts to light and resolve the dispute according to law, or (c) where the taxpayer has failed to maintain adequate records. Likewise, the court will decline to award attorney fees or other expenses where it appears that the taxpayer has been unreasonable, acted unlawfully or in any other circumstance which appears to justify the denial of such awards.

■ The amount to be awarded as reasonable attorney fees will depend upon the circumstances in each case. In addition to the factors normally considered as guides in determining the reasonableness of a fee,[2] the court will consider the extent to which counsel has been of assistance to the court in making a decision.

■ In this case the taxpayers were seeking a refund of $1,693.64, plus interest. Plaintiffs' claim for attorney fees based on time records amounts to $3,525.14. Counsel for plaintiffs commenced representation after the Department of Revenue hearing. In light of the nature of the case, the amount of tax involved, and the other circumstances, the court finds that a reasonable attorney fee in this case is $3,000. Plaintiffs' claimed costs and disbursements in the amount of $181.64 and

---

[2] *See* Oregon State Bar Disciplinary Rule DR 2-106(b).

expert witness fee in the amount of $543.25 are allowed. Plaintiffs' claim for reasonable expenses for food, lodging and travel in the amount of $200.23 are not allowed. The court views the "reasonable expenses" language of ORS 305.490(2)(b) as being intended to reimburse items similar to those defined by ORCP 68A.(2).[3]

Judgment will be entered in accordance with the above decision.

---

[3] ORCP 68A.(2) defines costs and disbursements as "reasonable and necessary expenses incurred in the prosecution or defense of an action other than for legal services, and include the fees of officers and witnesses; the necessary expenses of taking depositions; the expense of publication of summonses or notices, and the postage where the same are served by mail; the compensation of referees; the necessary expense of copying of any public record, book, or document used as evidence on the trial; * * *."