T.C. Memo. 2000-253


UNITED STATES TAX COURT


MADELINE COOK, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 7592-99.                    Filed August 10, 2000.


Joseph D. Anroman, for petitioner.

Michael P. Breton, for respondent.


MEMORANDUM OPINION

WELLS, Chief Judge:  Respondent determined deficiencies in petitioner's 1994 and 1995 Federal income taxes in the amounts of $5,750 and $18,541 respectively.

The issues for decision are:  (1) Whether petitioner is entitled to a $120,800 business bad debt deduction for 1994 (with

a resultant net operating loss carryforward to 1995 of $71,143)
for loans made to her son's business; and, (2) whether a
substantial portion (67 percent) of the income derived by
petitioner during 1994 and 1995 from the sale of the family
business should be characterized as long-term capital gain
pursuant to section 1231.[1]

Some of the facts have been stipulated and are so found.
The facts stipulated by the parties are incorporated herein by
reference and are found as facts in the instant case.  Petitioner
resided in Litchfield, Connecticut, at the time she filed the
petition in the instant case.

Background

Petitioner Madeline Cook and her late husband owned 51
percent of the stock of a closely held S corporation named Cold
Springs Water and Cooler Co., Inc. (Cold Springs).  Alexander
Cook (petitioner's son) owned the other 49 percent of Cold
Springs stock.  On April 29, 1991, all of the assets of Cold
Springs were sold to Puro Corporation of America, Inc. (Puro).
Pursuant to a sales agreement between Puro and Cold Springs, Puro
was to make installment payments to Cold Springs on the basis of

---

[1]     Unless otherwise noted, all section references are to the
Internal Revenue Code in effect for the years in issue and all
Rule references are to the Tax Court Rules of Practice and
Procedure.

the performance of Cold Spring's accounts receivable after the sale.

Also pursuant to the sales agreement between Cold Springs and Puro, petitioner's son was offered employment with Puro, which he declined. Instead, after the sale of Cold Springs to Puro, petitioner's son went into the catering business, doing business as Hamilton Caterers, Inc. (Hamilton). Petitioner's son purchased Hamilton for $650,000. He paid $100,000 in cash and obtained seller financing for $550,000. Petitioner's son was the sole owner of that business.

In connection with the operation of Hamilton, petitioner's son borrowed funds from the Jerry Kaplan Company of New Jersey (Kaplan) in the approximate original amount of $80,000 during 1992 (the Kaplan loan). As security for the Kaplan loan, petitioner's son pledged the income stream due to Cold Springs from Puro to Kaplan.[2]

---

[2] At trial, petitioner's son testified that he was an officer and director of Cold Springs and had the capacity in that position to pledge the Cold Springs assets as security for the loan from Kaplan. As a 51-percent shareholder, petitioner appears to have had the ability to block her son from pledging the income stream. Whatever power she had to block the pledge, however, she did not exercise it, as, in her words, she stated: "Well, my husband and my son always took care of the business affairs. I was not knowledgeable about that."

From 1991 through 1994, petitioner made a total of 19 loans to Hamilton, which were personally guaranteed by petitioner's son, totaling $120,800. Neither Hamilton nor petitioner's son made any payments on these loans. Hamilton performed miserably and ceased doing business in 1994. Petitioner's son failed to meet his obligations under the Kaplan loan, and by 1994, Kaplan attached approximately $96,000 of the Puro income stream.

Discussion

Section 166(a)(1) provides, in general, for the deduction of debts that become wholly worthless during a taxable year. Section 166, however, distinguishes between business bad debts and nonbusiness bad debts. See sec. 166(d); sec. 1.166-5(b), Income Tax Regs. Business bad debts may be deducted against ordinary income if they become wholly or partially worthless during the year (in the case of the latter, to the extent charged off during the taxable year as partially worthless debts). See sec. 1.166-3, Income Tax Regs. To qualify for the business bad debt deduction, the taxpayer must establish that the debt was proximately related to the conduct of the taxpayer's trade or business. See United States v. Generes, 405 U.S. 93, 103 (1972); Whipple v. Commissioner, 373 U.S. 193, 201 (1963); sec. 1.166-5(b), Income Tax Regs. The test for determining whether a particular debt bears a proximate relationship to the taxpayer's

trade or business was announced in United States v. Generes,

supra at 103, as follows:

> in determining whether a bad debt has a "proximate"
> relation to the taxpayer's trade or business, as the
> Regulations specify, and thus qualifies as a business
> bad debt, the proper measure is that of dominant
> motivation, and that only significant motivation is not
> sufficient.

Dominant motivation is determined at the time the taxpayer makes

the loan, Harsha v. United States, 590 F.2d 884 (10th Cir. 1979),

and is a question of fact to be decided on the basis of the

entire record.  See Putoma v. Commissioner, 66 T.C. 652 (1976),

affd. 601 F.2d 734 (5th Cir. 1979).

Nonbusiness bad debts, on the other hand, may be deducted,

but only if they become entirely worthless during the year

claimed; they are, moreover, to be treated as short-term capital

losses.  See sec. 166(d).  Generally, a nonbusiness bad debt is a

debt other than a debt (1) created or acquired in the trade or

business of the taxpayer or (2) the loss from the worthlessness

of which is incurred in a trade or business of the taxpayer.  See

sec. 166(d)(2).  Whether a debt is characterized as business or

nonbusiness is a question of fact.  See sec. 1.166-5(b)(2),

Income Tax Regs.  The burden is on petitioner to prove that she

was engaged in a trade or business, and that her worthless loans

constituted business rather than nonbusiness bad debts.  See Rule

142(a); <u>United States v. Generes</u>, <u>supra</u> at 104; <u>Whipple v. Commissioner</u>, <u>supra</u> at 202.

Petitioner reiterated several times at trial that the reason she made the loans to Hamilton, despite her son's miserable performance as a caterer, was to protect the Puro income stream from being attached by Kaplan.  Assuming that her dominant motivation was as she stated, and not some other motivation, such as not wanting to see her son fail in his new business, that does not by itself mean that the debt is a business bad debt.  Before a debt can be a business bad debt, there must be a trade or business of the lender to which the debt relates.  See, e.g., <u>Whipple v. Commissioner</u>, <u>supra</u> at 201-202.

At trial, respondent asked petitioner why she continued making loans to Hamilton even though the business was failing. She acknowledged that it was to protect her <u>investment</u> in Cold Springs.  (Emphasis added).  Respondent also elicited a statement from petitioner that, subsequent to the sale of Cold Springs' assets to Puro, Cold Springs was no longer "in the trade or business" of operating a water company.  Petitioner was not an employee of Cold Springs or Hamilton, nor was she in the business of making loans.

On her 1994 and 1995 Federal income tax returns, petitioner attached a Schedule C reporting business activity from her travel

agent business. The fact that she reported her travel agent business activities on a Schedule C does not preclude petitioner from being involved in another trade or business. On the other hand, being a shareholder of a corporation in which she admittedly has little involvement, see supra note 2, does not mean that petitioner is in the trade or business of that corporation.

On the basis of the entire record in the instant case, we conclude that petitioner was merely a 51-percent shareholder of a company that, after the sale of its assets to Puro, served as nothing more than a conduit for payments from Puro that were applied for the benefit of petitioner and her son. Cold Springs was not in a trade or business after the sale of its assets to Puro. Moreover, even if Cold Springs were in a trade or business, petitioner's limited involvement with Cold Springs does not provide sufficient nexus between the loans to Hamilton and any business of petitioner's own to qualify the debts as bad business debts. See Whipple v. Commissioner, supra at 202. Because petitioner's loans to Hamilton were not proximately related to a trade or business carried on by petitioner, they are not business bad debts. Accordingly, petitioner is not entitled to a business bad debt deduction for the loans made to Hamilton.

Petitioner proffers an alternative argument. Cold Springs failed to file corporate tax returns after the taxable year ended December 31, 1993. Because no corporate returns were filed and no Schedules K-1 were prepared, there is no information available upon which to make an allocation of the distributions to her from Cold Springs with respect to ordinary income and capital gain. Petitioner argues, therefore, that we should make such an allocation on the basis of extrapolations from Cold Springs' 1992 and 1993 tax returns.

Petitioner asks the Court to recharacterize ordinary income, as she reported it on her individual income tax returns, as long-term capital gain, on the basis of her contention that "it is very likely, if not certain, that a substantial portion of the income would have been [so] characterized" if Cold Springs had filed returns in 1994 and 1995. Petitioner contends that approximately 67 percent of the income that she received from Cold Springs during 1994 and 1995 should be recharacterized as long-term capital gain pursuant to section 1231. Petitioner's contention is rooted in the treatment of the distributions from Cold Springs' 1992 and 1993 income tax returns where 64 percent and 70 percent, respectively, of the funds distributed were characterized as section 1231 gains.

Petitioner reported the distributions from Cold Springs as ordinary income on her tax return. There is nothing in the record establishing that such reporting was incorrect. Cold Springs failed to file tax returns or prepare Schedule K-1 for the years at issue. If petitioner was entitled to capital gains treatment for a portion of the distributions from Cold Springs, then she should have caused Cold Springs to file a return and accompanying Schedules supporting such treatment. We hold that petitioner has not shown her entitlement to capital gains treatment for the 1994 and 1995 distributions. Accordingly, the distributions are still ordinary income to petitioner.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent.</u>